UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RODNEY MOSS,<br><br>    Plaintiff,<br><br>    v.<br><br>SAGE BLUFF HEALTH & REHAB<br>CENTER, LLC.<br><br>    Defendant. | CAUSE NO.: 1:22-CV-036-HAB-SLC |

**OPINION AND ORDER**

A few weeks after Plaintiff, Rodney Moss, ("Moss"), contacted his employer's complaint hotline to report what he viewed as misandry by his female supervisor, Moss claims his employer unlawfully terminated him. He brought suit asserting sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* He also asserts a retaliation claim. His employer, Sage Bluff Health & Rehab Center, LLC ("Sage Bluff"), says it fired him for insubordination, not for any discriminatory reason.

Before the Court is Sage Bluff's Motion for Summary Judgment (ECF No. 34) filed along with a supporting brief and materials. (ECF Nos. 35, 36). Plaintiff responded with his own supporting brief and materials (ECF Nos. 41-43) to which Defendant replied (ECF No. 50), making the matter ripe for consideration. Because the Court finds no genuine issues of material fact exist warranting a trial on either claim, the Defendant's motion will be GRANTED.

**DISCUSSION**

**I.    Applicable Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## II. Factual Background

Sage Bluff is a health care and nursing facility specializing in senior rehabilitation, skilled nursing, and long-term care services. Moss began his employment in June 2013 as the corporate maintenance director at Grey Stone Health and Rehab ("the Grey Stone facility").[1] (Deposition of

---

[1] The parties have not explained to the Court the relationship between the Grey Stone facility and Sage Bluff. As best the Court can discern Saber Healthcare Group ("Saber") serves as an umbrella corporate entity that operates skilled nursing, rehabilitation care, long term care, assisted living, memory care, and personal care services in Ohio, Indiana, and other states. https://www.saberhealth.com/. Both Grey Stone and Sage Bluff are listed as facilities offering these services on Saber's website. Moss testified that he was originally hired by Grey Stone, (Moss Dep. at 23) and then moved to Sage Bluff once it was built. There is a reference to Moss driving between facilities in Ohio and Sage Bluff.

2

Rodney Moss, ECF No. 43-6 at 22) ("Moss Dep. at __"). When Saber expanded and built its Fort Wayne, Indiana facility ("the Sage Bluff facility"), Sage Bluff employed Moss as its Maintenance Director. As the Maintenance Director, Moss explained he was generally responsible for preventive maintenance at Sage Bluff and in charge of vendors coming into the building. He also worked with Saber in the training and mentoring of maintenance personnel "all over" including in Ohio. (Moss Dep. at 24-25). Sage Bluff described Moss' responsibilities more specifically to the Sage Bluff facility stating that he oversaw the maintenance, housekeeping, and laundry departments and was responsible for ensuring the facility was operating safely in compliance with all governing regulations. Moss also managed the personnel within the designated departments.

While he was at the Grey Stone facility, Moss completed a preventive maintenance program for that facility. When he moved to the Sage Bluff facility, Moss transferred the program from the Grey Stone facility to Sage Bluff. (Moss Dep. at 29). As part of this program, Moss was required to maintain a preventive maintenance manual ("the Manual") for the Sage Bluff facility. The Manual is a hard copy, written binder that maintains a detailed record of the maintenance and facility records for Sage Bluff.

Sage Bluff uses the Manual to ensure that its facility has complied with all facility, state, and federal regulations. If, for instance, Indiana instituted new maintenance or safety requirements, Moss would add it to his maintenance program and, in turn, to the Manual. (Moss Dep. at 30). State regulators annually reviewed the plan and the Manual. (*Id.* at 31). As Moss described it, "Life Safety would come in and look at the preventive maintenance book, making sure everything is up to date for vendors, for quarterlies, yearlies, anything that's due. And then they'd all do a walk-around visit, like a visual visit of the outdoor and the inside areas." (*Id.* at 32-33).

---

If the Court understands correctly, Moss drove to other Saber facilities as part of his position at Grey Stone. (Moss Dep. at 25).

In December 2020, Sage Bluff hired April Haggerty ("Haggerty") as the facility's interim administrator. Haggerty, in turn, supervised Moss. When asked in his deposition about Haggerty, Moss testified "…I got along with everybody, but I don't think she got along with me for some reason." (Moss Dep. at 36). When asked to elaborate Moss said, "I just – the way she talked to me, the way she acted toward me, and you could tell with everyone else, all the other supervisors. It was just a different – different atmosphere." (*Id.*).

Moss described Haggerty's interactions with him. He testified that "almost daily" Haggerty would give him overlapping assignments. For instance, he contends that Haggerty would instruct him to paint a room immediately and then tell him to stop painting the room because a "room move" needed done. (Moss Dep. at 38-39). Although housekeeping and nursing normally assisted with room moves, Haggerty told Moss to do it because "it's too heavy for them and you're a man." (*Id.*). Haggerty denies making this statement and stated that there was no set protocol for who assisted with room moves. (Sept. 14, 2022, Deposition of April Haggerty, ECF No. 43-3, at 22-23) ("Haggerty Dep. II at ___"). Prior to Haggerty's arrival, Moss claims he did not assist with room moves. Haggerty also added tasks to his job responsibilities such as scheduling of housekeeping and laundry, ordering supplies, and transporting residents using the facility bus. (Moss Dep. at 42-43). He had not been required to do these tasks before Haggerty coming on board. Haggerty disputes some of these facts.

Moss also complains that Haggerty would call him in to take care of the trash whether it's "on my shift [or] after shift." (Moss Dep. at 45). He testified that Haggerty would tell him "it was too dark outside" and Moss should do it "because you're a man" and "it's too heavy for the women to lift and it's too dark out there … and too scary for the women to do it." (*Id.*). Haggerty denies

4

making these statements. Haggerty does admit that she "contacted the maintenance director to come and take the trash if needed." (Haggerty Dep. II at 24).

In early 2021, Moss was out sick for four days. When he returned to his office, the Manual was not where he had left it. (Moss Dep. at 49). According to Moss, only a few people had keys to his office. Haggerty told her that Kevin Kauffman ("Kaufmann"), a regional manager, went into the office to get it and told Moss to contact him. (*Id.*). Moss contacted Kauffman and Kaufmann denied taking the Manual. When Moss informed Haggerty that Kaufmann did not take the Manual, he states she told him, "[y]ou need to have that within 10 days." (*Id.*). Moss told Haggerty, "That's not possible. I can't make up a year's worth of [preventive maintenance] in 10 days. It's just not possible to do." (*Id.* at 49-50). In response, Haggerty told Moss that if he did not get it done "there will be stuff you have to answer for." (*Id.*).

Haggerty has a different recollection of these events. In her deposition, Haggerty testified that she "would have probably given him a month" to look for the manual. (August 18, 2022, Deposition of April Haggerty at 74 ("Haggerty Dep. I at ___"). Yet, in an email to Moss, Haggerty wrote:

> We are requesting a new life safety manual be created immediately and all documents from vendors in it by the end of this week, Friday February 12th. This is a major hit to our community and it is needed to be addressed immediately. Two weeks have went by so we need it completed asap. Please confirm you aware of this concern and ask for assistance if you are not getting what is needed. We will assist you in any manner we can but we need you to initiate this for us.

(ECF No. 43-7 at 40) (all sic).

Between the time the original Manual was lost and the time of Moss' termination, Haggerty testified that she had a new binder containing "the little pieces" that Moss told her he worked on "because he was trying to put it together again." (Haggerty Dep. at 88). Even so, Moss agrees he

did not meet the February 12, 2021, deadline set by Haggerty in the email for him to recreate the Manual. Moss was not written up or disciplined in any way for losing the Manual.

The same day Moss received the email instruction to recreate the Manual, Moss called the "Red Flag Reporting Hotline," which is Sage Bluff's employee misconduct hotline, to complain about Haggerty. Notes in the case report from the call reflect that Moss told the hotline personnel:

> Since the beginning of January 2021, April has been displaying a disrespectful and degrading behavior toward Rodney and some other male managers. April has been approaching Rodney in a very unprofessional and rude way, making Rodney feel completely uncomfortable and harassed by her attitude. This situation has been completely unacceptable in the workplace because April's behavior has disrupted the peace of the work environment and has led to a very hostile work environment for Rodney. Rodney has not understood where all this disrespectful behavior has come from because April just picks on Rodney with no valid reason just because he is a male. [Sage Bluff] has to do something about it because it is unacceptable from April to display this kind of behavior in a professional environment, making other male employees feel uncomfortable and stressed because of her. There are many witnesses to the situation, but the caller does not want to disclose information about them. This is the first time the caller is reporting the incident.

(Case Rep., ECF No. 35-1 at 44-46). According to the report, the case was assigned to Kyle Carter ("Carter"), who was the Human Resources representative for the building. Several individuals, including Haggerty, were provided case access.[2] Moss testified that Carter told him that his hotline complaint was sent directly to Haggerty and "to be honest with you, nothing is probably going to be done." (Moss Dep. at 78). Haggerty denies being notified of Moss' hotline complaint, but she does not dispute being listed on the report. The report lists the date closed as the same date that Moss called. Under the "Synopsis section" of the report the primary outcome is "unsubstantiated." Under potential next steps, the following is written: "Staff member [Moss] is being held accountable to schedule and daily duties. Interim Admin [Haggerty] has kept me updated throughout." (*Id.* at 46).

---

[2] It is unclear from the record what "case access" means.

During this same time frame, the COVID-19 pandemic was in full swing nationwide. Sage Bluff had begun screening staff and non-residents entering the building for COVID-19. For a portion of this time, the Indiana National Guard assisted Sage Bluff with the screening. But once it was no longer assisting, Sage Bluff's directors, including Moss as the maintenance director, operated the screening site at the facility on a rotating basis. Moss worked the screening site on February 22, 2021, and was asked to work it again on February 23, 2021. Moss informed Haggerty that he could not work it on February 23 because he had a vendor arriving that he was required to meet. According to Moss, though, he asked other department heads (all female) to work the screening site on his behalf so he could attend to the vendor.

Yet "[t]he best-laid schemes of mice and men go oft awry."[3] The next day, the Indiana State Board of Health unexpectedly arrived onsite at Sage Bluff. This caused a disturbance in the normal course of operations at Sage Bluff since other department heads, such as the Director of Nursing, had to meet with the Board of Health representatives. While in the normal course, Haggerty had no problem with department heads arranging for substitute staff to work the COVID-19 screening site, because of the Board of Health's unanticipated visit it was not feasible to have anyone else work the screening site. Haggerty had to have Moss work the screening site to allow other department heads to do their respective jobs with residents. For this reason, Haggerty instructed Moss to operate the screening site on February 23.

Moss does not dispute that he refused to work the screening site. (Pltf's Resp. to Statement of Facts, ECF No. 42, ¶ 13, admitting Moss refused to work the screening facility on February 23). For his part, he explains that he reminded Haggerty that he had a vendor arriving onsite and that

---

[3] Burns, R. (1786). To a Mouse. In R. Burns, *Poems, Chiefly in the Scottish Dialect* (p. 138-140). Kilmarnock: John Wilson. (English Translation).

he believed he should attend to the vendor and others could work the site for him. After Haggerty asked him several times to work the site, Moss walked away from Haggerty and into the parking lot.

Haggerty believed that Moss' refusal constituted a critical offense under the Sage Bluff progressive discipline process and warranted termination. (Employee Handbook, ECF No. 35-1 at 36-37). She filled out a Disciplinary Action Form (ECF No. 35-1, at 42) and in the detailed description of the incident, Haggerty wrote, "Refusal to carry out work assignments as directed (insubordination)." *Id.* Haggerty wrote in the description of counseling given to employee: "Termination – Associate has refused to do duties previously requested by Int[erim] Admin today he told me he was not relieving person at desk for screening – 3 times in less than 5 minutes." (*Id.*). Haggerty stated that Moss refused to sign the disciplinary action form and the form indicates "refused" next to employee signature. Moss, however, said he never saw the disciplinary action form.

At some point after the disciplinary action form was completed but before he was officially terminated, Sage Bluff claims it offered Moss the position of maintenance assistant/helper, which would not require him to perform COVID-19 screenings. Haggerty testified that she talked to HR and "they decided to go ahead and eliminate the position and offer [Moss] the assistant's position." (Haggerty Dep. at 30, 76). According to Haggerty, Moss declined the position. Moss claims that he was never offered the position of maintenance assistant. (Moss Aff., ECF No. 43-8, ¶4).

Haggerty filled out and signed an Employee Separation Report on March 9, 2021. (ECF No. 35-1 at 43). That report indicates that Sage Bluff terminated Moss for poor work performance and because his position was eliminated. In the explanation section, Haggerty wrote:

> Maint. Director lost his "PM" manual. Was given time to revamp & get information, binder still wasn't put together. M[aint.] Director refused to sit in

8

>break area to do screening of staff members when requested by Admin. We decided to elimate[sic] position. Offered him maint. helper & he refused.

*Id.* Moss's signature was not required on the form and does not appear on the form. Moss also states that he never received a copy of the Employee Separation Form. (Moss Aff. ¶5).

During all these events, Moss' wife, Jennifer, also worked for Sage Bluff as a floor nurse. (Deposition of Jennifer Moss, ECF No. 43-4, at 8) ("Jennifer Dep. at ___"). Jennifer testified that Haggerty "didn't like" Moss and that she learned this from two other employees. (*Id.* at 9). One employee, Rachel Bender, who was the assistant director of nursing, allegedly told Jennifer that "April was mean to Rodney or yelling at Rodney." (*Id.* at 10). Jennifer also testified that once, she overheard Haggerty speak to another male employee, Bruce Lightfoot ("Lightfoot"), in a demeaning way. Jennifer did not, however, witness any interactions between Haggerty and Moss. Finally, Jennifer claims that near the time Moss was terminated, Haggerty passed her in the hallway and made the comment, "oh, won't be long now." (*Id.* at 12). Jennifer believes that Haggerty was suggesting it "won't be long until she got rid of me or Rodney." (*Id.*).

**III. Analysis**

*A. Sex Discrimination*

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). If an employer moves for summary judgment on a sex discrimination, the burden falls to the plaintiff to present "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 762 (7th Cir. 2016). Thus, in Moss' case the "sole question that matters" is whether a reasonable juror could conclude that Moss

would have kept his job if he had a different sex, and everything else had remained the same. *Id.* at 764. In assessing this question, the Court may use the "burden-shifting framework" announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). *Id.* at 766. But *McDonnell Douglas* is not the only way to assess evidence of discrimination. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination"). As explained in *Ortiz*, a Court may also simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *David*, 846 F.3d at 224.

Because the parties analyze this case under the *McDonnell Douglas* framework, the Court will do the same. Under *McDonnell Douglas*, a plaintiff establishes a prima facie case of sex discrimination if [he] demonstrates, by a preponderance of the evidence, that: (1) [he] is a member of a protected class; (2) at the time of termination, [he] was meeting [his] employer's legitimate employment expectations; (3) despite meeting the legitimate employment expectations of [his] employer, [he] suffered an adverse employment action;[4] and (4) [he] was treated less favorably than similarly[-]situated [female] … employees." *Peele v. Country Mut. Ins.*, 288 F.3d 319, 326 (7th Cir. 2002). Once this prima facie case is made, "'the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext.'" *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). The parties' briefs focus on the first two elements.

Because it is the "unusual employer who discriminates against majority employees," courts in this Circuit modify the first element for plaintiffs who are not members of historically

---

[4] The parties are in agreement that Moss' termination is an adverse employment action.

discriminated-against groups. *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456–57 (7th Cir. 1999). A male plaintiff alleging sex discrimination must show "background circumstances" or "evidence that there is something 'fishy' going on" to establish his membership in a protected class. *Farr v. St. Francis Hosp. & Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009) (citation omitted). *See Phelan,* 347 F.3d 684 (quoting *Purtue*, 963 F.3d at 601–02) ("When a plaintiff is a member of a majority—for instance, a male plaintiff alleging gender discrimination—we have said he must set out background circumstances that show the employer discriminates against the majority, or he must show there is something fishy going on.") (internal quotation omitted).

Moss argues several "background circumstances" that he believes suggests anti-majority discrimination was at play at Sage Bluff. For instance, he argues it is "fishy" that he was terminated for not working the COVID-19 screening unit when he had made arrangements for three female department heads that could substitute for him while he was working with the vendors. He believes that female department heads were permitted to have other people work their COVID-19 screening days and they were not fired. He also asserts that Haggerty assigned him tasks because he was a man such as having him take the trash out at night because female employees did not want to do it in the dark. Finally, he points to his wife's testimony that other employees told her Haggerty didn't like Moss and she witnessed Haggerty yelling in a demeaning way to the male weekend supervisor, Lightfoot, as evidence that Sage Bluff discriminated against male employees.

"The contours of what constitutes a background circumstance are not precise," *Mills*, 171 F.3d at 455, and the parties have not expounded on the type of evidence that would lend itself to a finding that the first element would be met. The Seventh Circuit has explained that the plaintiff must demonstrate that there are facts which, even if "far from actual evidence of discrimination, are enough to overcome the background presumption that a [ ] man was not subject to employment

11

discrimination." *Id.* (analyzing a reverse race discrimination case). A plaintiff may meet this burden with "evidence of schemes to fix performance ratings to their detriment, that the hiring system seemed rigged against them because it departed from the usual procedures in an unprecedented fashion, or that they were passed over despite superior qualifications." *Id.* (citation omitted). Another way might be that there exists an industry wide pattern of discrimination against men within a particular field, *Napier v. Orchard Sch. Found.,* 2023 WL 2388715, at *8 (S.D. Ind. Mar. 7, 2023); or, through evidence that the person responsible for the employment decision was a minority, *Zambetti v. Cuyahoga Comty. Coll.,* 314 F.3d 249, 257 (6th Cir. 2002). Regardless of the type of evidence presented, Plaintiff must raise an inference that his employer discriminated against men in general, *Hurlow* v. *Toyota Motor North America,* 2024 WL 689961 at *9 (N.D. Ill. Feb. 20, 2024) or against men as a class. *Treadwell v. Am. Airlines, Inc.*, 447 F. App'x 676, 678 (6th Cir. 2011) (finding plaintiff failed to produce evidence in reverse race discrimination case "permitting the inference that the company discriminates against Caucasians as a class.").

Having reviewed Moss' evidentiary presentation, the Court is not at all convinced that Moss' focus on his individual circumstances, without more, is what is contemplated by the modified prima facie case. *See Golash v. Trinity Health Corp.*, 2023 WL 2024462, at *4–5 (E.D. Mich. Feb. 15, 2023) (holding that Golash must present information about his employer's treatment of male employees that would provide a contrast with its treatment of individuals of other genders and Golash's own situation cannot provide that contrast, as "some indication of impermissible discrimination in addition to the plaintiff's own poor treatment is necessary to support an inference of impropriety."). But whether the Court finds his evidence sufficient to meet the first element of the prima facie case has no impact on the outcome of this case; when a defendant employer argues "that the employee was not meeting legitimate job expectations, the

12

credibility of the employer's assertion is at issue for both the [satisfactory-work element] of the plaintiff's prima facie case and the pretext analysis." In such cases, the Court "may skip the initial burden shifting of the [*McDonnell Douglas* approach] and focus on the question of pretext." *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) ("[i]t is not always necessary to march through this entire process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof."). "And, in fact, this is more in keeping with the 'whole evidence' outlook espoused by this court in *Ortiz*, 834 F.3d at 764–65." *Brooks v. Avancez*, 39 F.4th 424, 435–37 (7th Cir. 2022).

Moving past the prima facie case then, the question of pretext and employer expectations do overlap here. Moss was not meeting Sage Bluff's legitimate expectations if he was refusing to follow Haggerty's instructions to work the COVID-19 screening site. Insubordination is a non-discriminatory reason for termination, *see Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) ("[i]nsubordination is a legitimate, nondiscriminatory reason for firing an employee"), and so, the Court turns to the ultimate question of whether Moss can demonstrate the reason given is pretext for unlawful discrimination.

Pretext means "more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) (*citing Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). The sole concern regarding the issue of pretext is the honesty of the decisionmaker's explanation. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997). Because courts are not superpersonnel departments, a decisionmaker's sincere, nondiscriminatory beliefs do not offend the law. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). Thus, an employer's mistaken or

incorrect conclusions do not evince pretext. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason."). Thus, where the evidence a plaintiff presents is argument about the accuracy of the employer's determination, that "is a distraction ... because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest.*'" *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 744 (7th Cir. 2002) (*quoting Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (emphasis in original)).

Moss' contentions and evidence fall short of satisfying his burden here. The undisputed record is that Sage Bluff terminated Moss for his refusal to work the COVID-19 site and for losing the Manual. On this score, Moss admits that he did not work the COVID-19 screening site after being directed to do so by Haggerty but Moss contends that Sage Bluff gave shifting or inconsistent explanations for his termination, and these explanations raise a question of fact as to pretext. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005). He argues, for instance, that he did not lose the Manual and he was not written up for losing the Manual until the day he was terminated. He believes that the issues with the Manual could not have driven the termination decision.

Even if the Court agreed with Moss that there is evidence suggesting that the "lost Manual" did not motivate his termination, Moss offers nothing to rebut Sage Bluff's explanation that he was insubordinate when he refused the order from Haggerty to work the COVID-19 screening site. The fact that the employer may have had other reasons as well does not show pretext. *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1292 (10th Cir. 2022). Indeed, so long as any one

of the non-discriminatory reasons support the employer's action, that is enough. *Fischer v. Avanade, Inc.,* 519 F.3d 393, 403 (7th Cir. 2008) (when a defendant has offered multiple nondiscriminatory reasons for its [employment] decision, showing that one of these reasons is pretextual is not enough). Simply stated, Moss has offered no evidence calling into question Sage Bluff's honest belief that his conduct in refusing Haggerty's directive to work the COVID-19 screening site constituted insubordination.

Finally, even if Moss had raised a genuine issue of fact as to pretext, he offers not a shred of evidence that Sage Bluff's decision was motivated by discriminatory animus. While he points to a few stray remarks from Haggerty related to men taking out the trash or lifting heavy objects, there is nothing connecting the termination decision and the stray remarks to demonstrate discrimination against males motivated Sage Bluff's decision. See *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("While such statements are in no way acceptable in the workplace or otherwise, 'stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.'")).

Construing the facts and all reasonable inferences in his favor—as the Court is required to do at this procedural posture—Moss has not presented sufficient evidence creating a genuine issue of material fact for trial concerning his reverse sex discrimination claim. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017) (if the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted.") (quoting *Celotex*, 477 U.S. at 322).

### B. Retaliation

Moss is no better off with his retaliation claim. To succeed on a retaliation claim, a plaintiff must prove that "(1) he engaged in statutorily protected activity; (2) the employer took adverse action against him; and (3) the protected activity caused the adverse action." *Id.* Moss need not prove that "retaliation was the *only* reason for h[is] termination; []he may establish a retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005)).

There is no question that Moss engaged in statutorily protected activity by calling the employee hotline to lodge a complaint against Haggerty. And he experienced an adverse action when he was terminated from his position. The only question is whether there is a connection between the two. "Therefore, we need only determine whether the record established by [Moss] supports the inference that [he] established a causal connection between the two events." *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009).

Moss asserts that human resources told him that his complaint went to Haggerty and no action would be taken on it. This, he contends, is evidence that Haggerty became aware of his complaint and twelve days later terminated him. The real problem for Moss, even if the Court accepts his assertions that Haggerty was looking for a reason to terminate him after she learned of his hotline complaint, is that he admits the insubordination that resulted in his termination. He asserts various reasons why he believes he was not insubordinate – namely, he had vendors to meet – but as with his sex discrimination claim, his challenge to whether Sage Bluff was correct in finding his conduct to be insubordination is a red herring. "A retaliation claim requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012) (citing *Kauffman v. Federal Express Corp.*,

16

426 F.3d 880, 884 (7th Cir. 2005)). Between the time of his hotline complaint and his termination, he admits engaging in conduct that, rightly or wrongly, was interpreted as insubordination by Sage Bluff.  He offers no evidence that Sage Bluff harbored any retaliatory intent in making its termination decision. Summary judgment is proper on Moss' retaliation claim.

## CONCLUSION

Based on the above, the Defendant's Motion for Summary Judgment (ECF No. 34) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant.

SO ORDERED on February 27, 2024

                                              s/ Holly A. Brady
                                              CHIEF JUDGE HOLLY A. BRADY
                                              UNITED STATES DISTRICT COURT